Geraldine **WATSON**, as Administratrix of the Estate of James Watson, and Marshall Watson and Gregory Watson, by Geraldine Watson, Their Mother and Next Friend and Administratrix of the Estate of James Watson, Appellant (Plaintiff Below),

v.

**MEDICAL EMERGENCY SERVICES, CORP.,** Mary D. Bush, W. Larry Corbett, Methodist Hospital Radiologic Group, Inc., Kenneth Keller, George B. Pratt, and Methodist Hospital of Indiana, Inc., Appellees (Defendants Below).

No. 29A02–8709–CV–00354.

Court of Appeals of Indiana, Second District.

Jan. 16, 1989.

Rehearing Denied Feb. 14, 1989.

Gordon Dempsey, Sutherlin & Dempsey, Indianapolis, for appellant.

Mary Beth Claus, Jon D. Krahulik, Bingham Summers Welsh & Spilman, Indianapolis, for George B. Pratt and Methodist Radiologic Group.

David S. Allen, Todd J. Kaiser, Locke Reynolds Boyd & Weisell, Indianapolis, for Mary D. Bush, M.D., Kenneth Keller, M.D., and Methodist Hosp. of Indiana.

Douglas V. Jessen, Statham, McCray, Thomas & Krohn, Evansville, for W. Larry Corbett, M.D. and Medical Emergency Services.

SULLIVAN, Judge.

Geraldine Watson appeals a summary judgment granted in favor of defendants.

We affirm.

Geraldine's medical malpractice complaint asserts negligent failure to diagnose and treat her husband's lung cancer. The operative facts are undisputed. In August of 1979 and in January of 1980, James Watson consulted the emergency room of Methodist Hospital complaining of cold symptoms. In January, the attending emergency resident, Mary Bush, took x-

rays of James' chest but neither she nor her supervising physician, Dr. W. Larry Corbett, nor radiologists Dr. Keller and Dr. Pratt diagnosed James as having lung cancer. James did not seek further medical attention until April of 1980. On April 22, 1980, it was recommended that a lung biopsy be performed, but James refused. In June of 1980, a lung biopsy was performed and revealed terminal cancer. James died in September of 1980.

When Geraldine filed the proposed complaint, the medical review panel unanimously concluded that the physicians involved had not breached their duty of care. After this lawsuit was filed, the Hamilton Superior Court granted summary judgment against Geraldine, finding no genuine issue as to any material fact.

■ Our focus upon review is to determine whether there is any genuine issue as to any material fact and whether the defendants were entitled to a judgment as a matter of law. *Burke v. Capello* (1988) Ind., 520 N.E.2d 439; *Ferrell v. Geisler* (1987) 1st Dist.Ind.App., 505 N.E.2d 137, *trans. denied.* If the trial court's grant of summary judgment is sustainable on any theory or basis in the record, we will affirm. *Gorski v. Deering* (1984) 4th Dist. Ind.App., 465 N.E.2d 759, *trans. denied.* However, any doubt concerning the existence of a genuine issue of material fact so as to preclude the granting of summary judgment must be resolved against the defendants here. *McNabb v. Mason* (1970) 148 Ind.App. 233, 264 N.E.2d 623. Rarely is a negligence case an appropriate case for disposal by summary judgment, especially when it is disputed whether the conduct of defendants measures up to the standard of due care. *Bassett v. Glock* (1977) 2d Dist., 174 Ind.App. 439, 368 N.E.2d 18. *McNabb, supra,* 264 N.E.2d at 626, states:

"Even where the trial judge may surmise that the proponent of a motion for summary judgment is likely to prevail at the trial, this is not a sufficient basis for refusing the respondent to a motion for summary judgment his day in court with respect to any genuine issue as to a material fact."

■ Geraldine's claim for negligence rests upon the physicians' failure to diagnose and treat James' lung cancer in January of 1980 as well as failure to obtain or direct follow-up diagnosis and treatment. The success of the claim depends upon the establishment of each of the following elements:

(1) That defendants owed a duty to James;

(2) That defendants breached this duty by permitting their conduct to fall below the set standard of care; and

(3) That defendants' breach of duty proximately caused James to suffer a compensable injury.

*See Burke, supra,* 520 N.E.2d 439; *Dolezal v. Goode* (1982) 3d Dist.Ind.App., 433 N.E.2d 828, *trans. denied.*

■ In order to achieve reversal of the summary judgment, however, Geraldine need not carry that burden. Rather, we must decide whether in the motion for summary judgment defendants showed the undisputed nonexistence of at least one of these elements. When the affidavits or other evidence filed by the defendants here establish the lack of a genuine issue of material fact, the burden is upon Geraldine to demonstrate the existence of a genuine issue. *See Johnson v. Padilla* (1982) 2d Dist.Ind.App., 433 N.E.2d 393, *trans. denied.*

■ It is undisputed that a duty was owed to James. As to whether this duty was breached, there is conflicting evidence. The physicians herein must exercise the degree of skill which other physicians possess and exercise in the same fields or specialties and in the same or similar locality. *Burke, supra,* 520 N.E.2d 439; *Wilson v. Sligar* (1987) 1st Dist.Ind.App., 516 N.E.2d 1099, *trans. denied.* The general and conclusory affidavit of Dr. Sandra C. Denton states that the physicians failed to obtain a more complete history on James and to seek follow-up care. The affidavit does not state wherein the history was deficient or inadequate or what follow-up care should have been given. When we consider Dr. Denton's affidavit along with Dr.

Darrel S. Mandel's and Dr. Ned B. Hornback's depositions, which conclude that cancer was not a likely diagnosis from the symptoms and that follow-up tests were not indicated from the x-rays taken, we cannot say that there is a genuine issue of fact as to whether a breach of duty of care occurred. Nevertheless, we will assume arguendo that Dr. Bush and/or other responsible persons should have sought a more complete medical history and conducted tests or examinations following up the x-rays. Having made the assumption that a genuine issue of material fact was presented upon the issue of breach of the duty of care, summary judgment was inappropriate unless the third element, that defendants' negligence proximately caused James' harm, was undeniably absent. *Yaney v. McCray Memorial Hospital* (1986) 3d Dist.Ind.App., 496 N.E.2d 135.

The test for determining whether a negligent act or omission is the proximate cause of an injury is whether the injury is a natural and probable consequence which should have been foreseen. *Yaney, supra,* 496 N.E.2d 135. When the issue of proximate cause is not within the understanding of lay persons, testimony of an expert witness on the issue is necessary. *Id.*

In the present case, several experts gave their opinion as to whether the cancer was diagnosable in January and whether it was treatable once detected. Dr. Walter J. Daly expressed the following opinion:

"The Methodist Hospital x-ray was not indicative of lung cancer. In my opinion, disseminated cancer certainly was one possibility to explain the abnormalities noted, but only one of a large number of possibilities." Record at 323–24.

At his deposition, Dr. Ned B. Hornback agreed:

"Dr. Daly and I were in agreement that the patient did not have [advanced malignancy]. The diagnosis could not have been made on the chest x-ray.... There was no evidence in the medical records of this, that the diagnosis could be made." Record at 419, Deposition at 18.

"He may have had it [disseminated uncurable and non-remedial cancer], but

there was no way to diagnose it.... It certainly was not diagnosable in January." Record at 419, Deposition at 19–20.

"[I]f the patient survived eight months, he couldn't possible have had cancer or it is extremely unlikely that he had cancer in January of '80." Record at 419, Deposition at 34.

Dr. Darrel S. Mandel testified at his deposition:

"No, I would say that I could not say that there was any evidence of cancer on these films. If I were to read these films I could not say that there was evidence of cancer on these films." Record at 448, Deposition at 7.

When asked whether it was possible to diagnose the cancer in January based upon the radiological reports, even after the fact with the benefit of hindsight, Dr. Mandel said no. In her affidavit, Dr. Sandra C. Denton agreed:

"As pointed out by other physicians who have looked at the films, from January 15, 1980, the films could have been indicative of cancer, but since *it was not the most probable diagnosis*, and it is not normal practice to expect the radiologists to have available the clinical picture or history at the time they look at the films, I could not say it did not meet the standard of care for said physicians not to alert the emergency room physician to the possibility of cancer as an explanation of the abnormalities in such films." Record at 318 (emphasis supplied).

The final such evidence was that of Dr. George Byington Pratt, III:

"In my opinion, no competent radiologist could conclude that these films suggest the presence of cancer in the lungs." Record at 312.

Thus, the respective opinions are in agreement that cancer was not a probable diagnosis in January of 1980, at least from the x-rays taken. Geraldine contends that the requisite standard of care called for further testing from which the cancer would have been detected. Even were the evi-

dence susceptible to a conclusion that the cancer was diagnosable in January had the testing procedures been more complete, the summary judgment must be sustained if Geraldine has not demonstrated a genuine issue as to whether the cancer was treatable at the time.

■ For purposes of considering whether compensable damages were proximately caused by some negligent act or omission of defendants, we will assume that the cancer was discoverable in January of 1980. Our task then becomes a determination as to whether the cancer was treatable so as to prolong James' life.

Geraldine's argument that James' life could have been prolonged had he received treatment earlier is unsupported by the thrust of the experts' opinions and if supported at all, only weakly, by some speculative statements which were made. Dr. Daly stated:

"Had the malignancies been diagnosed in January, I believe no cure was possible. Furthermore, I believe no significant palliation or prolongation of life was possible.

It is my professional opinion, that this unfortunate man had disseminated, uncurable and non-remedial cancer at the time he presented for help in January of 1980 at Methodist Hospital." Record at 323–24.

Dr. Hornback agreed:

"[T]here is no cure for them, the type of disease that this man had." Record at 419, Deposition at 19.

Dr. Hornback also stated hypothetically that if chemotherapy or radiation were used once hilar lobes were discovered in the lungs, the cancer could improve but probably would not. If the lung cancer were interstitial ("an infiltration of the malignant tumors, multiple spread of it through the lymphatics, which are small vessels that carry lymph" (Record at 419, Deposition at 47)), ordinarily the patient is "in such bad condition, that they have got spread of the tumor throughout. Oc-casionally you might get someone to respond by that means. There may be an improvement of the chest x-ray. But ordinarily, we do not treat patients who have interstitial involvement of the lungs, because they are just too far advanced." Record at 419, Deposition at 46–47.

Dr. Mandel also expressed his opinion of radiation and chemotherapy treatments. Regarding cancer which had metastasized (spread) within a lung (not from another location), he said that chemotherapy would more likely be used than surgery but

"may work, it may not work. It may work for six months, it may work for a year, it may not. The cancer might progress despite it or it might work for five years.... I assume that it works on some patients." Record at 448, Deposition at 36.

If the cancer had metastasized to the lung, Dr. Mandel stated that chemotherapy would not relieve the patient of his symptoms or prevent the spread of the disease.

■ A reading of the lead opinion in *Noblesville Casting Division of TRW, Inc. v. Prince* (1982) Ind., 438 N.E.2d 722 in conjunction with *Palace Bar, Inc. v. Fearnot* (1978) 269 Ind. 405, 381 N.E.2d 858, leads us to the conclusion that although testimony of medical experts "to a reasonable medical certainty" is not required, testimony as to mere possibilities will not alone suffice. *See also Kaminski v. Cooper* (1987) 3d Dist.Ind.App., 508 N.E.2d 29, *trans. denied; Terre Haute First National Bank v. Stewart* (1983) 1st Dist.Ind. App., 455 N.E.2d 362, *trans. denied.* Although Geraldine was not obligated to present evidence sufficient to establish her claim, once defendants established the lack of a genuine issue as to the proximate cause of James' death, Geraldine had to come forward with sufficient evidence showing the existence of a genuine issue for trial. *See Stumph v. Foster* (1988) 4th Dist.Ind.App., 524 N.E.2d 812; *Bassett, supra,* 368 N.E.2d 18. The above opinions

**1196**

which express mere possibilities with regard to some treatments in hypothetical situations fail to establish a genuine issue of fact on a necessary element of a medical malpractice suit. None of the experts stated that James' life could have been saved or even prolonged had he begun receiving treatment in January.[1] Despite any conflicting facts and inferences on other elements of the claim, summary judgment is proper where there is no real conflict regarding facts dispositive of the litigation. *Ellis v. Smith* (1988) 3d Dist.Ind.App., 528 N.E.2d 826.

Because Geraldine has not adduced sufficient evidence to disclose an issue of fact as to one of the elements necessary for a negligence claim, i.e., proximate cause, we hold that the trial court properly granted summary judgment for defendants.[2] The judgment is affirmed.

RATLIFF, C.J., and BUCHANAN, J., concur.

---

1. We note that the record reveals other possible concurrent causes of James' death. A diagnosis made on April 23, 1980, states that the cancer was "presumed secondary to asbestosis." Record at 220. Although a biopsy was recommended at this point, James refused it. Consequently, his lung cancer was not fully diagnosed or treated until June of 1980.

2. Indiana precedent has not specifically adopted the medical malpractice rule of proximate cause which is couched in terms of "loss of chance." This doctrine, as employed in other jurisdictions, requires establishment by a plaintiff that if proper treatment had been given, better results would have followed. *See generally* Annot., 54 A.L.R.4th 10 (1987). Application of the doctrine in the various jurisdictions varies with respect to the degree of proof necessary. Some jurisdictions require that the plaintiff establish more than a 50% chance of a better result, absent the malpractice, while others merely require evidence that the risk was increased or the opportunity to achieve a better result diminished. We do not consider the proximate cause issue before us by application of the "loss of chance" doctrine. Rather, as above noted, we resolve the matter solely in terms of our prior law with respect to proximate cause and that the evidence must disclose more than a mere possibility. *But see Graham v. State* (1985) 1st Dist.Ind.App., 480 N.E.2d 981, 994, *cert. denied*, 479 U.S. 1007, 107 S.Ct. 646, 93 L.Ed.2d 702; which, in a criminal context of causation, refers to a treatment which "could have extended" the deceased's life.